[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13204

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 16, 2010
JOHN LEY
CLERK

D.C. Docket No. 04-20211-CR-AJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHELDON KRESLER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 16, 2010)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,* District Judge.

PER CURIAM:

_____

\* The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

This is an appeal from a judgment, entered after a jury trial, convicting the appellant, Sheldon Kresler, of one count of conspiracy in violation of 18 U.S.C. § 371, seven counts of wire fraud in violation of 18 U.S.C. § 1343, one count of prescription drug diversion in violation of 21 U.S.C. §§ 331(t), 333(a)(2), 353(c)(3)(A)(i) and 353(c)(3)(A)(ii)(II), one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h), and nine counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Kresler, who had an extensive criminal history, was sentenced principally to ninety-six months of incarceration. On this appeal, he challenges both his conviction and sentence.

## BACKGROUND

### I.     The Scheme to Defraud

Kresler and co-defendant William Walker were co-owners of Crystal Coast Inc. ("Crystal Coast"), a pharmaceutical resale company based in Miami, Florida. Kresler and Walker established Crystal Coast in order to purchase pharmaceuticals from various sources and resell the drugs to wholesalers at a profit. In November 1999, Leonard Schecter, an acquaintance of Kresler's, introduced Kresler and Walker to Mark Linden, another co-defendant, who was the owner of Marisa Trading. Linden informed Kresler and Walker that he could secure quantities of InFed, a branded generic drug used to treat iron deficiency and anemia produced by Schein

Pharmaceuticals Inc. ("Schein"), at a low price through Charles Williams, also a co-defendant. Williams, who was the executive director of African Christian Relief ("ACR"), a 501(c)(3) charitable organization, had contacted a representative of Schein's humanitarian aid division to procure InFed for distribution to Angola, Africa. Williams had submitted materials to Schein, including documentation substantiating that ACR was a registered 501(c)(3) organization and ACR's annual report. Schein agreed to provide InFed at the rate of $88.00 per unit, a deep discount from its normal price.

Williams never intended to ship the InFed acquired from Schein to Angola. Instead, he planned to sell the drugs on the domestic market for a hefty profit. Kresler and Walker, through Crystal Coast, agreed with Williams and Linden to sell the InFed obtained from Schein to wholesalers at a significant markup from their purchase price. Crystal Coast, however, did not have a pharmaceutical wholesalers license. Consequently, Crystal Coast arranged to use the license held by James P. Lyons & Son, a company based out of Fort Lauderdale, Florida. At trial, Walker testified that he knew this arrangement was illegal.

Kresler, Walker, Williams and Linden retained an attorney, Louis Terminello, of Terminello & Terminello, to act as an escrow agent. In essence, Crystal Coast would sell InFed to wholesalers, who would remit a portion of the purchase price to

3

the escrow account held by Terminello.  Terminello would then distribute a portion of these proceeds to Schein for the purchase of the pre-sold InFed.  Once the payment was received by Schein, it would ship the purchased InFed to freight forwarder Vene-Embarque, Inc. ("Vene-Embarque"), which was located in Miami.  Kresler or Walker (or both) would physically pick up the InFed from Vene-Embarque, repackage the drugs, and in some cases personally deliver it to the wholesalers.  Once delivery was completed, the wholesalers would remit the remainder of the purchase price to Crystal Coast or Terminello.  Terminello would then distribute the remaining profits to the co-conspirators, after deducting fees for himself, Schecter, and James P. Lyons & Son.

Between November 1999 and January 2000, Williams ordered eight shipments of InFed from Schein, totaling 22,718 units at a total cost of $1,999,184.00.  Of the eight shipments, seven were processed as contemplated.  Prior to the final shipment, Schein discovered that Crystal Coast had been reselling drugs obtained from ACR, and cancelled the last order.  In all, Crystal Coast sold the seven successfully-received shipments to wholesalers for $3,058,690.00.  Over the three months that the scheme was operational, Kresler and Walker each earned a total of approximately $500,000 from these transactions.

## II.     Kresler's Flight to Israel

Because the principal issue raised on this appeal relates to Kresler's claim that he was deprived of his right to a speedy trial, we set out a detailed narrative of the undisputed facts relating to the cause of the delay. On October 1, 2003, Kresler was interviewed by Special Agent Mallon of the Food and Drug Administration at a Denny's Restaurant in Miami. At that interview, Kresler indicated his willingness to cooperate with the investigation regarding ACR and Williams. On February 6, 2004, during a telephone conversation, Kresler told Agent Mallon that he was in Israel and that he would return to the United States at some point in the next month. Kresler agreed to contact Mallon when he returned to the United States. On March 2, 2004, Mallon again contacted Kresler by telephone. This time, Kresler indicated that he had broken his leg in Israel and would not return to the United States for another six to eight weeks.

The grand jury returned an indictment against Kresler on April 8, 2004. On June 23, 2004, presumably in response to a request for assistance by the United States, INTERPOL provided Kresler's street address in Israel to the United States Attorney and advised that Kresler's name was in the border control lookout list. INTERPOL also provided a request for consideration of arrest and extradition, and this request was sent to the International Department at the Israeli Ministry of Justice

for further evaluation. By then, Kresler had become an Israeli citizen. The request for extradition apparently was not pressed because the United States Attorney was under the mistaken belief that Israel would not extradite one of its citizens. Since 1999, however, Israeli law permitted extradition for its citizens for some offenses (including fraud) provided that the sentence imposed was served in Israel.

Nevertheless, INTERPOL continued to track Kresler's movements. On September 2, 2005, INTERPOL provided information that Kresler had reserved airline tickets from Tel Aviv to Geneva under the name of "Ariel Kersler" for a flight on August 28, 2005. Subsequently, on September 11, 2005, Kresler sent an email to Walker's wife boasting that he "[had] a way for all the charges to be dropped against [Walker], but it will cost money!" Ten days later, on September 21, 2005, Kresler sent another email to Walker's wife asking, "Do you want Billey boy to stay in jail?" Kresler attached a printout of the docket sheet in this case, which indicated that Kresler was one of the defendants.

Kresler continued to travel to and from Israel. On December 19, 2005, INTERPOL obtained information that Kresler had re-entered Israel three days prior. On April 27, 2006, Agent Mallon sent a draft red notice to INTERPOL, which operated as a request to INTERPOL's member nations to arrest Kresler if he entered their jurisdiction, and, if possible, to extradite him to the United States. On May 22,

2006, INTERPOL advised that "Ariel Kresler" had traveled from Israel to Austria on January 26, 2006, but the Austrian authorities could not confirm that Kresler had entered the country. On May 29, 2006, INTERPOL finalized publication of the red notice to all of its 183 member countries.

On June 5, 2006, Kresler was arrested by Polish authorities at Krakow Airport. Kresler had traveled there under an Israeli passport with the name "Ariel Kersler." Kresler did not waive extradition, thus necessitating formal extradition procedures. Consequently, Kresler was not extradited to the United States until November 30, 2006. Kresler's initial appearance in federal court was on December 1, 2006. Trial was initially set for January 16, 2007, but was continued on Kresler's motion until August 21, 2007. After trial, the jury convicted Kresler of all of the offenses charged in the indictment with the exception of one money laundering charge.

## DISCUSSION

Kresler contends that (1) the district court erroneously denied his motion to dismiss the indictment based on a violation of his Sixth Amendment right to a speedy trial; (2) the evidence presented was not sufficient to sustain his conspiracy, wire fraud and money laundering convictions; (3) the district court erroneously admitted evidence; and (4) the district court imposed an unreasonable sentence. Each of these claims is without merit.

7

## I. Speedy Trial

We review the district court's denial of a motion to dismiss based on a defendant's right to a speedy trial *de novo*. *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996) (per curiam). The Sixth Amendment guarantees that all criminal defendants "shall enjoy the right to a speedy . . . trial." The Supreme Court has enunciated a four-part test to determine whether a defendant's speedy trial right has been violated: (1) the length of the delay, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as a result of the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Harris*, 376 F.3d 1282, 1290 (11th Cir. 2004).

"[T]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay . . . ." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992) (citation omitted). Typically, delays exceeding one year will be considered "'presumptively prejudicial,'" meaning that "the delay [is] unreasonable enough to trigger the *Barker* enquiry." *Id.* at 652 n.1 (citations omitted). "If, after the threshold inquiry is satisfied and the second and third factor are considered, all three of these factors weigh heavily against the Government, the defendant need not show

8

actual prejudice (the fourth factor) to succeed in showing a violation of his right to a speedy trial." *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006) (citation omitted).

The length of the delay for speedy trial purposes is calculated from the date of the indictment to the trial date. *United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003). Kresler was indicted on April 8, 2004, and his trial commenced on August 21, 2007. Consequently, the length of the delay was slightly more than forty months. Nevertheless, he complains only of a thirty-three-month delay, presumably because he sought and received a seven-month continuance of the original date set for trial following his extradition. The delay of which he complains, although not as long as in some other cases, *see Doggett*, 505 U.S. at 648 (eight and one half year delay); *United States v. Hayes*, 40 F.3d 362, 364 (11th Cir. 1994) (five year delay), is sufficiently long to trigger the *Barker* inquiry. Accordingly, we proceed to consider whether the second factor (blame for the delay) and the third factor (the defendant's assertion of his right to a speedy trial) weighed sufficiently heavily against the defendant so that prejudice to the defendant will not be presumed.

Our consideration of these two factors brings to mind the Yiddish word "chutzpah," which has evolved into a legal term "analytically similar to 'unclean hands,' though not necessarily coterminous with that concept as understood in

9

Chancery." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 128 n.5 (2d Cir. 2009). As Judge Cabranes has observed, "[t]he 'classic definition' of chutzpah has been described as 'that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan.'" *Id.* (quoting Leo Rosten, The Joys of Yiddish 92 (1968)). Courts "have employed the 'classic definition' and contemporary variations where a party's conduct is especially and brazenly faulty" or where judges "encounter such flagrant abuses that no single word adequately expresses appropriate disgust." *Id*. (citations omitted).

This definition aptly fits Kresler's claim that he was denied his right to a speedy trial notwithstanding the extraordinary efforts he took to avoid prosecution, during which he also hatched a scheme to either obstruct justice or defraud his co-defendant Walker by offering to have the charges dropped in return for cash. While Kresler's "absence from the country did not relieve the government of its obligations to make good-faith efforts to have him returned," *United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986) (citation omitted), our reading of the record persuades us that such efforts were made here. The United States actively sought the assistance of INTERPOL, with which it was continuously in contact. Indeed, it was a result of their joint efforts that Kresler was arrested in Poland and ultimately extradited to the United States, notwithstanding his efforts to oppose extradition.

10

Of course, the erroneous assumption that Kresler could not be extradited from Israel did contribute to the delay of which Kresler complains. Nevertheless, this is hardly sufficient to tip the scales in his favor on the issue of blame for the delay. As we held in a closely analogous case:

> The best that can be said is that if the government was at fault for not locating [the defendant] in [a foreign jurisdiction], it was clearly no more than mere negligence. "Though a purposeful attempt to delay the trial to prejudice the defendant or to gain a tactical advantage for itself should weigh heavily against the Government, *Barker v. Wingo*, . . . 407 U.S. at 531, . . . a more neutral reason, such as negligence, does not necessarily tip the scale in favor of the defendant, particularly where the defendant was at liberty and outside the jurisdiction where the indictment was returned."

*Id.* at 1544 (citations omitted).

Moreover, Kresler's outrageous behavior makes it impossible for him to argue that he asserted his right to a speedy trial in a manner required to tip the scales of the *Barker* analysis in his favor. As the Court of Appeals for the District of Columbia has held, where a defendant is aware that charges are pending against him, "his failure to make any effort to secure a timely trial on them (and his apparent desire to avoid one) manifests a total disregard for his speedy trial right." *United States v. Tchibassa*, 452 F.3d 918, 926 (D.C. Cir. 2006); *see also Rayborn v. Scully*, 858 F.2d 84, 92 (2d Cir. 1988) ("[W]hen it is manifestly apparent that a defendant has no serious interest in

11

the speedy prosecution of the charges against him, a court need not ignore the defendant's fugitivity or recalcitrance in determining whether his sixth amendment rights have been violated."). Nor need a court ignore the delay caused by the defendant's efforts to avoid extradition (in this case almost six months). *See United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995) ("[Defendant] cannot avoid a speedy trial by forcing the government to run the gauntlet of obtaining formal extradition and then complain about the delay that he has caused by refusing to return voluntarily to the United States."). In sum, Kresler was a "reluctant defendant who was not concerned with a speedy trial." *Bagga*, 782 F.2d at 1545 (citation omitted). Indeed, even after his return to the United States, he sought and obtained a seven-month delay of his initially scheduled trial date.

Finally, because the *Barker* factors weigh against Kresler, he is required to show actual prejudice. *Clark*, 83 F.3d at 1354. Kresler does not argue that he suffered any such prejudice. In sum, the delay between Kresler's indictment and trial did not violate his Sixth Amendment right to a speedy trial.

## II. Sufficiency of the Evidence and Evidentiary Rulings

We review the sufficiency of the evidence of conviction *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Suba*, 132 F.3d 662, 671 (11th Cir. 1998). "In applying this standard all reasonable inferences

12

and credibility choices must be made in favor of the jury verdict, and that verdict must be sustained if there is substantial evidence to support it when the facts are viewed in the light most favorable to the government." *United States v. Davis*, 666 F.2d 195, 201 (5th Cir. Unit B 1982) (citations omitted). Moreover, "[t]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989) (per curiam) (citation omitted).

## A. Sufficiency of Evidence of Wire Fraud and Conspiracy Counts

To establish that Kresler committed wire fraud, the United States Attorney was required to show: "(1) intentional participation in a scheme to defraud, and, (2) the use of the interstate wires in furtherance of that scheme." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citations omitted). Moreover, to sustain the related conspiracy convictions, he was required to prove that Kresler "knew of and willfully joined in the unlawful scheme to defraud . . . ." *Id*. (citation omitted). Circumstantial evidence can supply evidence of knowledge of the scheme. *Id.*

The evidence overwhelmingly established the existence of a scheme to defraud Schein, which was furthered by the use of interstate wires. Kresler argues, however, that "there was no evidence that he was aware of the scheme or that he acted

13

willfully." This claim is without merit. The evidence at trial established that Kresler knew that Schein was providing the drugs for shipment to ACR for shipment to Angola. Indeed, a letter written to Kresler from Terminello, the escrow agent, shortly after a meeting at which they and the others involved in the scheme were present, asked Kresler to provide:

> whatever documentation exists verifying that Crystal Coast, Inc., is properly licensed to wholesale pharmaceutical products, and that, in particular, Crystal Coast is authorized by African Christian Relief to organize and arrange for the procurement, distribution, and shipment of pharmaceuticals that are supplied by a manufacturer at a reduced price to African Christian Relief as a bona fide charitable organization.

While there is some question whether Kresler received this letter, due to a minor error in the street address, the inference is clear that it was written as a result of the discussions during the meeting. Indeed, Terminello testified that he understood that "Crystal Coast was going to . . . procure, organize, and arrange for the shipment of the humanitarian aid pharmaceuticals that they were acquiring from Schein . . . to the countries that the humanitarian aid was deemed for." Moreover, the invoices provided to Crystal Coast, copies of which Walker forwarded to Kresler (who was the bookkeeper and money manager of Crystal Coast), clearly indicated that the intended destination for all of the ordered InFed was Angola. Nevertheless, Crystal Coast sold

14

100% of the InFed ordered from Schein on the open market, and no orders were ever sent to Angola.

Kresler was also personally involved in the delivery of InFed to the ultimate purchasers. This activity began with an initial trial run that he and Walker conducted. Specifically, they ordered 100 units of InFed from Schein (which was paid for by Kresler), Walker and Linden picked up the InFed from Vene-Embarque, and they delivered it to their ultimate purchasers. After the trial run was successful, the number of units ordered and the revenues generated increased substantially. This activity established that he had personal knowledge of the domestic sale of InFed intended for Angola.

Moreover, Kresler, like Walker, must have understood that the large sums of money that they were earning, and the large profit margins from the resale of InFed, clearly suggested that Schein would have had no reason to provide InFed at such a discounted price to a private drug wholesaler as opposed to a charitable organization. Indeed, Walker himself acknowledged that he was "concerned . . . that what [he] was doing . . . was, in fact, improper." As Walker explained, the "situation [was] too good to be true," because "[v]ery seldom do you see the profit margin, or the margins in markup, in between paying $88 for something and turning around and selling it for [$]170."

The manner in which the transactions were structured also constituted circumstantial evidence of the fraudulent nature of the enterprise. Specifically, Kresler and his accomplices employed Terminello as an escrow agent who received payments for the InFed and remitted payment to Schein. The purpose of this arrangement, as Walker testified, was to hide from Schein the fact that Crystal Coast was purchasing the InFed. Kresler's participation in this arrangement was another fact from which the jury could infer that he was a knowing participant in the fraudulent scheme.

Finally, Kresler fled to Israel almost directly after his interview with Agent Mallon, at which he was questioned about his involvement in the scheme, he refused to return, and he refused to waive extradition. This evidence of consciousness of guilt was another factor that the jury was entitled to consider. *United States v. Borders*, 693 F.2d 1318, 1324 (11th Cir. 1982) ("It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.") (internal quotations and citations omitted).

## B. Evidentiary Rulings Related to Wire Fraud and Conspiracy Counts

Kresler challenges two evidentiary rulings relating to the wire fraud and

conspiracy counts. We review a trial court's evidentiary rulings for abuse of discretion. *United States v. Gunn*, 369 F.3d 1229, 1236 (11th Cir. 2004) (per curiam). Moreover, "evidentiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990) (citations omitted).

### 1. Ultimate Purchasers' Testimony

Kresler contends that the district court erroneously admitted testimony from the ultimate purchasers of InFed that they would not have purchased the drug had they known that they were originally sold by Schein for charitable purposes. One of the witnesses, Michael Burman of DIT, testified that the purchase would not have been legal. While there is no dispute that Burman's understanding of the law was correct, *see* 21 U.S.C. § 353(c)(3)(A)(ii)(II), Kresler argues that "[t]he question of whether these buyers had an opinion on the legality of Kresler's sale of pharmaceuticals to them was completely irrelevant" because "[t]he issue at trial was whether Kresler knowingly participated in a scheme to defraud *Schein*." (Emphasis added).

Kresler, however, was not only charged with a scheme to defraud Schein, but

17

he was also charged with violating 21 U.S.C. § 333(a)(2), and related provisions of the Food Drug and Cosmetic Act. Specifically, Count Nine of the indictment charged that, "with the intent to defraud and mislead, [Kresler] *did sell and offer to sell a quantity of Infed*, a prescription drug . . . which drug was previously supplied at a reduced price to ACR, a charitable organization . . . ." (Emphasis added). Under this section, the purchasers of the InFed could have been the victims of the fraud, as the indictment alleged and the district court instructed the jury. *See United States v. Bradshaw*, 840 F.2d 871, 873-74 (11th Cir. 1988) (Section 333(a)(2) encompasses intent to defraud consumers as well as federal enforcement agencies). Indeed, Kresler does not challenge the sufficiency of the evidence with respect to this count.

Consequently, the testimony elicited from the ultimate purchasers was relevant to explain why Kresler's failure to disclose the true source of the InFed would have been material to the purchasers. Moreover, it also demonstrated that persons employed in the wholesale pharmaceutical industry had at least a rudimentary knowledge of the laws and regulations against drug diversion. The jury could have inferred from this and other evidence that Kresler, who was employed in that industry, was also aware of these prohibitions, an issue that was relevant to his intent

18

on the wire fraud and conspiracy counts. In any event, in light of the overwhelming evidence of guilt on these counts, any error in the admission of this evidence was harmless.

## 2. Rule 404(b) Evidence

Kresler contends that the district court abused its discretion when it admitted evidence that subsequent to the charged scheme to defraud, he and Walker illegally obtained prescription medications from physicians, who were able to purchase these medications at a low cost, and resold them to wholesalers on the open market. Under Federal Rule of Evidence 404(b), evidence of "other crimes, wrongs, or acts" are "not admissible to prove the character of a person in order to show action in conformity therewith." It may, however, be admissible if it is relevant to an issue other than the defendant's character. *United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995). This rule applies to a subsequent act, as well as a prior act. *United States v. Schardar*, 850 F.2d 1457, 1463 (11th Cir. 1988); *United States v. Hurley*, 755 F.2d 788, 790 (11th Cir. 1985).

Kresler argues that the 404(b) evidence "was of little probative value given the fact that there was no evidence that Kresler was aware of the [InFed] scheme to defraud perpetrated by Charles Williams." This argument is belied by the circumstantial evidence of Kresler's knowledge of the scheme to defraud discussed

19

previously.  Kresler also argues that there was no evidence that the physicians from whom the medications were obtained were being defrauded.  This argument ignores the fact that the subsequent scheme, like the earlier one, involved obtaining medication and illegally reselling the medication to wholesalers.  Both schemes could not have succeeded without the efforts of Kresler and Walker to conceal from the ultimate purchaser the true provenance of the drugs.  Indeed, Walker testified that one of the reasons they removed the names of the doctors that the pharmaceutical company had affixed to the packages was that, if the purchasers would have been told "that we got it from a physician and the name was taken out, I doubt if they would have continued doing any business with us."  This conduct constituted fraudulent concealment of a material fact. *See Maxwell*, 579 F.3d at 1299 ("A scheme to defraud 'requires proof of material misrepresentations, or the omission or concealment of material facts reasonable calculated to deceive persons of ordinary prudence.'") (citation omitted).  Thus, even if the subsequent fraudulent scheme was not a mirror image of the charged fraudulent offenses, and we have held that they need not be, *United States v. Beechum*, 582 F.2d 898, 915 (5th Cir. 1978) (en banc), it was sufficiently similar to the charged offense to be relevant on the issue of Kresler's intent.  The relevance "derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses.  The

20

reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." *Id*. at 911 (footnote and citations omitted). As Professors Mueller and Kirkpatrick observe:

> [a]lleged fraud in different forms often find support in [other] fraudulent acts that tend to show intent or knowledge, particularly when the defendant claims in effect that he may have been mistaken or inaccurate in connection with the charged crime, but lacked an intent to deceive or cheat the purported victim.

Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence 823 (3d ed. 2007).

Moreover, even if the testimony was erroneously admitted, as a practical matter, it could not have prejudiced Kresler. The sole source of the evidence relating to the subsequent act was the testimony of Walker. Because he was an accomplice testifying pursuant to a cooperation agreement, he was a highly impeachable witness. Under these circumstances, his uncorroborated testimony with regard to the subsequent scheme simply added nothing to Walker's credibility as a witness and to the evidence against Kresler, for which there was substantial corroboration, on the charges of which he was convicted. In sum, if the jury found Walker to be credible, it would have convicted Kresler, even without Walker's testimony regarding the similar act.

## C. Sufficiency of Evidence of Money Laundering and Conspiracy Counts

In order to prove that Kresler committed money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government must show:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

*United States v. Miles*, 290 F.3d 1341, 1354-55 (11th Cir. 2002) (per curiam) (citation omitted). Kresler contends that the evidence was insufficient to establish that the transactions that were the subject of this charge were designed to "conceal and disguise" the nature and source of the transactions. *See Cuellar v. United States*, 128 S. Ct. 1994, 2003 (2008); *United States v. Majors*, 196 F.3d 1206, 1213-14 (11th Cir. 1999). This claim is without merit.

The evidence here established that once sales in InFed were consummated and the profits were realized, Kresler and his co-conspirators did not instruct Terminello to remit funds directly to their personal bank accounts. Instead, Kresler instructed Terminello to wire transfer $200,000 of his share of the fraud proceeds to the Barclays bank account for JAP International, an offshore company that Kresler

22

controlled. Similarly, Linden instructed Terminello to wire transfer his share of the proceeds to the Nations Bank account for Maris Trading and to the First Union National Bank of Florida account of Arsenault & Reardon. Walker instructed Terminello to pay his share of the proceeds to a law firm that was handling the closing for his purchase of a condominium in Florida. The jury was entitled to infer that the only purpose of these transactions, executed by Kresler and his accomplices, was to conceal the true nature and source of the funds.

## III.  Sentencing Issues

Kresler was sentenced principally to a period of incarceration of ninety-six months, four months less than the lower end of the range prescribed by the Sentencing Guidelines. The range was as high as it was in large part because Kresler's prior criminal history yielded a criminal history category of VI. Indeed, the range was almost twice as high as it would have been if his criminal history category was I. Kresler does not raise any procedural objections to his sentence. Consequently, we review Kresler's sentence only for substantive reasonableness. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

In conducting this review, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id*. The fact that we "might reasonably have concluded that a different sentence was

23

appropriate is insufficient to justify reversal of the district court." *Id.* Moreover, "the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both that record and the factors in section 3553(a)." *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). "[O]rdinarily we would expect a sentence within the Guidelines range to be reasonable." *Id.* Consequently, reversal of a procedurally proper sentence is only appropriate if "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. McBride*, 511 F.3d 1293, 1297-98 (11th Cir. 2007) (per curiam) (internal quotations and citation omitted).

Kresler raises two objections to his sentence: (1) that the district court failed to adequately consider Kresler's medical condition and his treatment by the Bureau of Prisons in imposing sentence; and (2) that the district court erroneously failed to apply a mitigating factor when calculating Kresler's guideline sentence for his minor role in the offense.

## A.    Medical Care

The district court judge carefully considered Kresler's medical history when imposing sentence, including testimony from Dr. Edwin Lopez, who treated Kresler

at the Federal Detention Center in Miami, and Kresler himself. Indeed, the district court imposed a ninety-six-month sentence, which was less than the minimum sentence prescribed by the Guidelines. While Kresler complains that this variance does not adequately take into account his medical condition, the weight afforded to this factor is within the discretion of the district court. *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007) ("The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court . . . .") (internal quotations and citation omitted).

## B. Minor Role Adjustment

A district court's determination of a defendant's role in an offense for sentencing purposes constitutes a factual finding to be reviewed only for clear error, and the district court has "considerable discretion in making this fact-intensive determination." *United States v. De Varon*, 175 F.3d 930, 937, 946 (11th Cir. 1999) (en banc). The defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled to a mitigating-role reduction. *Id*. at 939 (citation omitted). To determine whether this reduction applies, a district court first must "assess whether the defendant is a minor or minimal participant in relation to the relevant conduct attributed to the defendant in calculating [his] base offense level." *Id*. at 941. The district court also must "measure the defendant's culpability in

comparison to that of other participants in the relevant conduct." *Id.* at 944.

Here, Kresler's role in the relevant conduct was anything but minor. Indeed, as the district judge noted, "the only way the scheme could have succeeded for any one of the participants, was to . . . sell the product at a profit over the price that the product was obtained from [Schein], and in that critical aspect of the fraud, Mr. Kresler was a very important participant." Kresler's contentions that he "took no part in perpetrating the fraud that was committed against Schein" and that "there was no evidence that Kresler was even aware of the fraud" are belied by the extensive circumstantial evidence discussed previously. Consequently, the district court properly found that Kresler was not entitled to a minor role reduction.

## CONCLUSION

The judgment of conviction is **AFFIRMED**.