# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 6, 2006                    Decided July 7, 2006

No. 04-3023

UNITED STATES OF AMERICA,
APPELLEE

v.

ARTUR TCHIBASSA,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 91cr00560-03)

---

*Robert L. Tucker*, Assistant Federal Public Defender, argued the cause for the appellant. *A. J. Kramer*, Federal Public Defender, was on brief. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Lisa H. Schertler*, Assistant United States Attorney, argued the cause for the appellee. *Kenneth L. Wainstein*, United States Attorney, *Jennifer E. Levy*, Attorney, United States Department of Justice, and *Laura A. Ingersoll* and *Roy W. McLeese*, III, Assistant United States Attorneys, were on brief.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

2

KAREN LeCRAFT HENDERSON, *Circuit Judge*:    Artur Tchibassa, a former member of the Angolan "Front for the Liberation of the Enclave of Cabinda" (FLEC), appeals his conviction stemming from his participation in the 1990 hostage-taking for ransom of Brent Swan, a United States citizen then working in Cabinda, Angola.  Tchibassa appeals his conviction on the grounds that the government violated his Sixth Amendment right to a speedy trial by waiting until 2002, some eleven years after he was indicted, to arrest and prosecute him and that the court erred under Federal Rule of Evidence 404(b) in admitting testimony of a similar FLEC hostage-taking in 1994 and excluding testimony of FLEC hostage negotiations that he participated in in 1992 and 2001.  In addition, Tchibassa appeals his sentence on the ground that the district court treated the United States Sentencing Guidelines (Guidelines) as mandatory in violation of *United States v. Booker*, 543 U.S. 220 (2005). We reject Tchibassa's speedy trial claim because the government exercised reasonable diligence in seeking his arrest and because Tchibassa, who was aware of the charges against him since at least 1994, waited until after his arrest to assert his speedy trial right.[1]    We reject the evidentiary challenges because, assuming the district court's rulings were erroneous, the error was harmless.  Finally, we affirm Tchibassa's sentence because we conclude that the sentencing judge did not commit plain error.

---

[1]In resolving this case, we assume *arguendo* that Tchibassa was entitled to a speedy trial under the Sixth Amendment before he was arrested and brought to this country.  We therefore need not decide the question (not raised by the parties below or on appeal) whether the Sixth Amendment speedy trial right attaches to a foreign national—charged with a crime committed outside United States territory—while he remains outside our borders.

**I.**

In 1990 Brent Swan was working as an aircraft mechanic in Cabinda, a province of Angola, for Petroleum Helicopters, Inc. (PHI). PHI was a contractor for Cabinda Gulf Oil Company Ltd., a subsidiary of Chevron Overseas Petroleum, Inc. (Chevron), a United States corporation. On October 19, 1990, while traveling in a truck en route to the Cabinda Airport, Swan was abducted by three men wearing camouflage uniforms. Swan's captors, who identified themselves as FLEC members, forced Swan on a several-day trek on foot to a FLEC base camp where he remained until moved to a second camp.

Following extensive negotiations between FLEC and Chevron, on December 17, 1990, Swan was taken by his captors to Zaire (now the Democratic Republic of the Congo (DROC)), where he met a Zairean government official who was accompanied by a number of FLEC officers, including Tchibassa. From there he was driven to Moanda, Zaire and released to PHI foreign supervisor Gary Weber and Chevron executive Scott Taylor in exchange for a ransom.

Substantial trial evidence implicated Tchibassa as a high-ranking member of FLEC and a willing participant in Swan's abduction, detention and ransoming. Tchibassa was described by one of Swan's captors as a "major member" of FLEC, 9/4/03 Tr. 138, and was pictured alongside Swan, FLEC "President" Tiburcio and "Major" Bento in a photograph taken around Thanksgiving 1990 at the camp where he was being held. During the five-week negotiations for Swan's release, according to Chevron negotiators, Tchibassa participated as the "chief spokesman" and "did all the primary speaking as negotiator." 9/9/03 Tr. 62; 9/5/03 Tr. 184-85. In an order signed by Tiburcio authorizing Tchibassa to negotiate on behalf of FLEC, Tchibassa was identified as "Major Artur Tchibassa" and FLEC "Foreign Affairs Secretary." 9/5/03 Tr. 127. Finally, after the negotiators reached an agreement with Chevron requiring

Chevron to deliver a ransom in specified goods in exchange for Swan's release, Tchibassa was one of two men who signed receipts for the goods when they were delivered.

On September 25, 1991 Tchibassa was indicted under seal[2] on two counts: (1) conspiring to commit hostage-taking in violation of 18 U.S.C. §§ 371 and 1203 and (2) hostage-taking in violation of 18 U.S.C. §§ 2 and 1203. A bench warrant issued for his arrest the same day. On July 11, 2002, he was arrested in Kinshasa, DROC. His trial began on September 4, 2003 and the jury convicted him of both counts on September 12, 2003. On February 27, 2004 the district court sentenced Tchibassa to concurrent sentences of 60 months on the conspiracy count and 293 months on the hostage taking count, followed by three and five years of supervised release, respectively. The court also ordered Tchibassa to pay $303,957.34 in restitution and a $200 special assessment. Tchibassa filed a timely notice of appeal.

## II.

We address separately Tchibassa's challenges to the district court's speedy trial right determination, evidentiary rulings and Guidelines sentence.

### A. Speedy Trial Right

The Sixth Amendment to the United States Constitution expressly guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." Excessive delay in prosecuting a defendant after he is indicted or arrested violates this Sixth Amendment right. *See Barker v. Wingo*, 407 U.S. 514 (1972) (arrest); *Doggett v. United States*, 505 U.S. 647 (1992) (indictment). Tchibassa contends that the nearly 11 years that elapsed between his September 25, 1991 indictment and his arrest on July 11, 2002 constitute an excessive delay and that the

---

[2]The indictment was unsealed on September 4, 2003.

district court therefore erred in denying his motion to dismiss on that basis. We affirm the district court's denial of the motion.

In deciding a speedy trial claim a court applies a "balancing test, in which the conduct of both the prosecution and the defendant are [sic] weighed." *Barker*, 407 U.S. at 530. The United States Supreme Court has identified four factors to be considered: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id*.; *see also Doggett*, 505 U.S. at 651 ("Our cases . . . have qualified the literal sweep of the [speedy trial] provision by specifically recognizing the relevance of four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." (citing *Barker*, 407 U.S. at 530)). The first factor entails "a double enquiry": First, "[s]imply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett*, 505 U.S. at 651-52 (quoting *Barker*, 407 U.S. at 530-31). Next, once the accused makes this threshold showing, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id*. at 652 (citing *Barker*, 407 U.S. at 533-34). None of the four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial"; "[r]ather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533.

In order to balance the speedy trial factors, on August 26, 2003, the district court conducted an evidentiary hearing. The testimony from that hearing, supplemented by the parties' written submissions, revealed the following facts. Tchibassa testified that he resided in Kinshasa, Zaire from 1991 to 1998 and in Brazzaville, Congo, located across the Congo River from Kinshasa, from April 1998 until his arrest in 2002. The government filed a sealed arrest warrant for Tchibassa on September 25, 1991 and subsequently requested that Interpol issue "Red Notices" seeking his arrest (along with the arrest of other alleged participants in the Swan hostage-taking), which Interpol did in 1993.[3]

In 1994 Tchibassa learned that Interpol wished to speak with him and, accordingly, traveled to Brazzaville, Congo to meet with Interpol representatives, who questioned him about Swan's abduction. According to a transcription of Tchibassa's statement to Interpol at the meeting, he expressed surprise at learning that, in his own words, "American Judicial authorities issue [sic] an international arrest warrant for me for this case." 6/21/94 Interpol Interview Tr. 3, Appellant's App. (App.) 58. Also in 1994, according to Tchibassa's testimony, he visited the U.S. Embassy in Kinshasa, Zaire more than 5 times for "diplomatic activities," 8/26/03 Tr. 27, and continued to visit the Embassy ("[m]ore than five times" annually) until 1998, *id*. at 38. He also testified he visited the U.S. embassies in Lisbon in 1994 and Paris in 1995.

In 1996 the United States Department of State (State Department) learned Tchibassa had been in Brazzaville and, at the instance of the United States Department of Justice, cabled the U.S. Embassy there to request that the Congolese

---

[3]An Interpol Red Notice alerts foreign governments to the issuance of a U.S. arrest warrant. *See United States v. Bliss*, 430 F.3d 640, 643 (2d Cir. 2005).

government make "provisional arrests for the purpose of extradition" of Tchibassa and others charged with Swan's kidnaping. App. 78.

Finally, on July 11, 2002 the FBI arrested Tchibassa in the office of the DROC Intelligence Bureau and he was flown to Puerto Rico where he was arraigned on July 15, 2002. On April 21, 2003 he filed a motion to dismiss the indictment, asserting his Sixth Amendment speedy trial right.

At a November 25, 2003 hearing the district court denied Tchibassa's motion based on the parties' submissions and the hearing testimony. Initially, the court determined that the 11-year delay between indictment and arrest "obviously . . . was long" so as to trigger the balancing of the *Barker* factors. 11/25/03 Tr. 9. With regard to the second factor, the court found that the delay resulted "not only from the government's not arresting him once they had indicted him originally back in '91 . . . but from the defendant's own actions" because "at the time in the country where he was residing and was a citizen of," meaning Zaire/DROC, "they did not have an extradition treaty." *Id*. at 10. Absent a treaty, the court concluded, the government was under no obligation to take any extraordinary measures to negotiate for Tchibassa's extradition. The court found the third factor also weighed against dismissal because, although Tchibassa was aware of the charges against him since June 1994, he did not assert his speedy trial right until nine months after he was arrested in 2002. Finally, as to the fourth factor, the court characterized Tchibassa's claim of prejudice as "speculative" because the court "d[id]n't see any defense strategies or positions that would have been different except for the delay" or "any particular witnesses he didn't bring that he could have." *Id*. at 11. In sum, the court concluded that the record "strongly indicates . . . that the defendant did not want a speedy trial" and that "the government had no either [sic] obligation or opportunity to make arrest or get Mr. Tchibassa

extradited to the United States because of the political situation and the statutory requirements that existed at that time." *Id.* at 12. We review the district court's factual findings for clear error and its application of the *Barker* factors to the facts de novo. *See United States v. Parish*, 468 F.2d 1129, 1134 (D.C. Cir. 1972) (factual findings reviewed for clear error) (citing *Jackson v. United States*, 353 F.2d 862, 864-65 (D.C. Cir. 1965)); *United States v. Wallace*, 848 F.2d 1464, 1469 (9th Cir. 1988) (legal conclusions reviewed de novo); *Burkett v. Fulcomer*, 951 F.2d 1431, 1437-38 (3d Cir. 1991) (same); *see also United States v. Frye*, 372 F.3d 729, 736 (5th Cir. 2004) (suggesting, without deciding, review is de novo because "generally, a district court's balancing of factors, resulting in a decision, are [sic] akin to, if not, conclusions of law, or at least rulings on mixed questions of fact and law, reviewed *de novo*"). Applying these standards, we uphold the district court's ruling because its factual findings are not clearly erroneous and it correctly applied the law to the facts it found.

Initially, the parties agree that the district court correctly concluded that the length of the delay between Tchibassa's indictment and arrest—some eleven years—was long enough to be considered "presumptively prejudicial," i.e., beyond "the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Doggett*, 505 U.S. at 652 n.1; *cf. Barker*, 407 U.S. at 533 (undertaking inquiry where "length of delay between arrest and trial–well over five years–was extraordinary"); *Doggett*, 505 U.S. at 652 ("[T]he extraordinary 8 ½ year lag between Doggett's indictment and arrest clearly suffices to trigger the speedy trial enquiry.").

We next address *Barker*'s second factor—"whether the government or the criminal defendant is more to blame for that delay," *Doggett*, 505 U.S. at 651. Initially, the government was decidedly slow to seek Tchibassa's arrest. It does not appear from the record that it made any attempt to apprehend Tchibassa

from the time he was indicted on September 25, 1991 until Interpol issued the "Red Notices" sometime in 1993. This gap of more than two years casts some doubt on the government's diligence and might, under other circumstances, tip the balance against it. Here, however, the district court found that Tchibassa was more to blame than the government for the initial delay because he maintained his residence in Zaire, beyond the government's diplomatic reach, and this finding is not clearly erroneous.[4] Subsequently, when the government learned in 1996 that Tchibassa had been sighted outside Zaire—in Brazzaville, Congo in 1996—it cabled its Brazzaville Embassy to request that the Congolese government, with which the United States had an extradition treaty in force, effect his arrest. The Congolese government, however, did not do so even after Tchibassa moved to Brazzaville in 1998, notwithstanding the Red Notices were in effect until at least 1999.[5] While the government might have undertaken more frequent and extensive efforts to secure Tchibassa's arrest, it is not clear that any such effort would have succeeded so long as Tchibassa voluntarily remained beyond the United States' legal or practical reach.[6]

---

[4]The district court's reasonable diligence finding is reviewed "with considerable deference." *Doggett*, 505 U.S. at 652.

[5]Tchibassa claims that "the government admitted that Tchibassa had been at the U.S. Embassy in Brazzaville on several occasions from 1992-1994," Opening Br. 20 (citing 9/3/03 Tr. 2-5), but the cited transcript pages refer to Tchibassa's visits to the U.S. Embassy in *Kinshasa*, which is in Zaire/DROC, with which the United States had no extradition treaty.

[6]Tchibassa contends the government should have used "available alternatives" to extradition to effect Tchibassa's arrest, noting that his arrest in DROC in 2002 was not through extradition. Opening Br. 22. The record demonstrates, however, that alternative efforts would have been futile and ill-advised. *See* Decl. of Vincente Valle, App. 76 ¶ 3

Thus, the district court did not clearly err in finding that the government had no "opportunity to make arrest [sic] or get Mr. Tchibassa extradited to the United States." 11/25/03 Tr. 12. We therefore agree with the district court that the second factor weighs against Tchibassa because the fault for the delay in arrest lay primarily with Tchibassa himself. In this respect, the delay between Tchibassa's indictment and arrest differs significantly from the situation in *Doggett*, in which the Supreme Court found the defendant's speedy trial right had been violated.

In *Doggett* the defendant fled to Colombia, South America shortly after he was indicted on federal drug charges. After a brief incarceration in Panama, he was released to Colombia and he returned to the United States about 2 ½ years after the indictment. He settled in the Commonwealth of Virginia where he lived openly under his own name for six years before the government discovered him through a credit check and then made the arrest. The Supreme Court, upholding the district court's finding that the government was not diligent, concluded that the second *Barker* factor weighed heavily in Doggett's

("U.S. relations with the governments of [Zaire/DROC] over the relevant period would have made cooperation in the arrest of Mr. Tchibassa difficult"); App. 83, 84 (July 1996 cable from U.S. Embassy in Kinshasa to State Department advising extradition was "not practical" and "any attempt to take one or all [of four accused FLEC members] into U.S. custody will create the risk of retaliation against other U.S. citizens"). Further, there is persuasive authority that the government need not take extraordinary measures in order to satisfy the reasonable diligence standard. *See United States v. Diacolios*, 837 F.2d 79, 84 (2d Cir. 1988) ("Because the government's failure to obtain defendant's extradition was the result of reliance upon United States policy not to seek extradition outside the extradition treaty with Greece, we conclude that the government has satisfied its burden of demonstrating due diligence in seeking defendant's return for trial without unnecessary delay.").

favor because "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes." 505 U.S. at 652-53. Here, the record does not indicate U.S. authorities had any opportunity to readily apprehend Tchibassa. The delay in arresting Tchibassa was attributable primarily to his continued residence in an area over which the United States had no control and little influence. The second factor therefore favors the government.

For similar reasons, the third *Barker* factor—the defendant's invocation of the speedy trial right—favors the government as well. The district court found that, notwithstanding Tchibassa knew of the charges against him at least since the time of his 1994 meeting with Interpol, he made no effort to assert his speedy trial right until he filed a motion to dismiss on April 21, 2003, nine months after his arrest. Tchibassa disputes that he was aware of the charges before his arrest but the district court's contrary finding, based on the Interpol transcription, is not clearly erroneous.").[7] Tchibassa may have not have known that

---

[7]At a pretrial motions hearing, Tchibassa engaged in the following colloquy with the prosecutor:

Question:   Sir, when did you first learn of the criminal charges against you?

Answer:   When I was interviewed by Interpol [in 1994].

Question:   So they described the nature of the charges that the United States had filed against you?

Answer:   Of course there was an interview, so they had to disclose the charges.

8/26/2003 Hearing Tr. 40; *see also* 6/21/94 Interpol Interview Tr. 3, JA 58 (Tchibassa stating: "I am surprised to see that the American

a formal indictment had issued—or even that one was necessary—but if he was aware that charges were pending against him (as the district court reasonably found he was), his failure to make any effort to secure a timely trial on them (and his apparent desire to avoid one) manifests a total disregard for his speedy trial right. Thus, in this respect too, Tchibassa's situation differs from Doggett's, whose claim of ignorance of the charges against him was "unrebutted and largely substantiated." 505 U.S. at 654. The *Doggett* Court expressly noted that, if it were true, as the government suggested (contrary to the record), "that Doggett knew of his indictment years before he was arrested . . . , *Barker*'s third factor, concerning invocation of the right to a speedy trial, would be weighed heavily against him."[8] *Id.* at 653. Because the record supports the district court's finding that Tchibassa knew of all of the charges contained in the sealed indictment as early as 1994, the third factor also weighs against his speedy trial claim.

Finally, the fourth *Barker* factor—prejudice from delay—does nothing to advance Tchibassa's speedy trial claim. "[U]nreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will

---

Judicial authorities issue [sic] an international arrest warrant for me for this case . . . .").

[8]The *Doggett* Court appeared concerned generally with Doggett's awareness *vel non* that charges were pending against him rather than with his specific knowledge that a formal indictment had been filed. *See* 505 U.S. at 653-54 (citing as "substantiat[ing]" evidence of Doggett's "ignorance" "the testimony of Doggett's wife, who said that she did not know of the charges until his arrest, and of his mother, who claimed not to have told him or anyone else that the police had come looking for him").

be impaired' by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532). The first two listed harms are of no significance here as Tchibassa was not imprisoned until after his arrest and he displayed no concern over the years about the pending criminal charges, in fact denying he was even aware of them.[9] *Cf. id*. (noting Doggett could probably not claim first two harms "since he was subjected neither to pretrial detention nor, he has successfully contended, to awareness of unresolved charges against him"). This leaves only the third form of prejudice—possible impairment of the defendant's case—which the Supreme Court has described as " 'the most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " *Id*. (quoting *Barker*, 407 U.S. at 532). Tchibassa alleges only generally that the passage of time compromised his "ability to locate witnesses in West Africa who could confirm Tchibassa's role in FLEC and the Swan negotiations in 1991," Opening Br. 26, without identifying any material witness much less a failed attempt to locate one.[10]

---

[9]Nor was Tchibassa subject to public suspicion and hostility as the contents of the sealed indictment were not made public. *See Barker*, 407 U.S. at 533 ("[E]ven if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.").

[10]Tchibassa does point to his inability to recall the identity of the interpreter Taylor used in a 1994 conversation with Tchibassa in which, Taylor testified, Tchibassa admitted his role in the 1994 abduction of Dietrich. As we conclude below, however, the testimony regarding Dietrich's abduction, while probably wrongly permitted, was of little consequence to Tchibassa's defense or conviction. Tchibassa also cites his inability to identify some of the persons he met in the United States embassies in 1995 but does not explain—and we cannot discern—how the visits were material to his defense on the merits or how lacking the persons' identities impaired the defense.

In the absence of specific, articulable prejudice, Tchibassa relies largely on the "presumptive" prejudice that results from the mere passage of time. *See Doggett*, 505 U.S. at 654-55. As the *Doggett* Court noted, however, while "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett*, 505 U.S. at 655-56 (citing *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)). Because two of the other *Barker* criteria— fault for the delay and timely assertion of the speedy trial right—weigh heavily against Tchibassa, his claim of presumptive prejudice does not tip the scales in his favor. *See Doggett*, 505 U.S. at 656 ("[I]f the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as Doggett could not show specific prejudice to his defense."); *Barker*, 407 U.S. at 536 ("[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial.").

In sum, we conclude that the balance of the four *Barker* factors favors the government. Accordingly, the district court's denial of Tchibassa's motion to dismiss for violation of his speedy trial right is affirmed.

### *B. Evidentiary Rulings*

Second, Tchibassa contends the district court erred in two evidentiary rulings under Federal Rule of Evidence 404(b). Rule 404(a) bars admission of "Character Evidence Generally," directing that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Rule 404(b)

similarly prohibits evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith" but permits such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The government proffered the testimony of Piotr Dietrich, a Polish national, regarding Tchibassa's role in a 1994 FLEC hostage-taking in Cabinda, Angola, in which Dietrich was himself taken hostage, to show that Tchibassa was a willing participant in Swan's hostage-taking as well, and not, as Tchibassa maintained, simply a well-intentioned negotiator attempting to secure Swan's release. For his part, Tchibassa proffered the testimony of Martins Leitao, the owner of a Portugese construction company, relating to Tchibassa's role in negotiations for the release of Leitao's employees who were taken hostage by FLEC in 1992 and 2001, to show that Tchibassa's intent was to obtain Swan's freedom. The district court admitted Dietrich's testimony under Fed. R. Evid. 404(b) "to show [Tchibassa's] motivation, that is, intent and his actions, and lack of mistake or accident" to counter Tchibassa's claim, as the court characterized it, "that he was not responsible, that he came in as a person attempting to solve a difficult situation for his people" and "that he had no prior knowledge, and the subsequent knowledge was only as a participant in attempting to resolve it, not in attempting to continue detention of Mr. Swan in any way." 9/09/03 Tr. 120.[11] On the other hand, the court excluded Leitao's testimony, concluding that it "d[id] not meet the rule of relevancy" and "d[id] not qualify under 404(b)." 9/11/03 Tr. 11. Tchibassa asserts the district court erred in admitting Dietrich's testimony and then excluding Leitao's and that the exclusion of Leitao's testimony in particular deprived

---

[11]Additionally, the court found Dietrich's testimony was not prohibited under Rule 403 because its probative value was not outweighed by its prejudicial effect.

him of his right under the due process clause of the Fifth Amendment "to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284 , 302 (1973). We reject Tchibassa's challenge because, assuming arguendo the district court erred, the error was harmless.

Dietrich's testimony was of minimal value to the government—or harm to the defense—because the record was already replete with compelling and uncontradicted evidence that Tchibassa was a willing participant in the Swan hostage-taking: his characterization by other FLEC members as a "major member" of FLEC and by FLEC President Tiburcio as "Major Artur Tchibassa" and FLEC "Foreign Affairs Secretary," 9/5/03 Tr. 138; 9/5/03 Tr. 127; the photograph of Tchibassa in "[m]ilitary combat clothing" with hostage Swan in the FLEC base camp, 9/09/03 Tr. 49; 9/10/03 Tr. 37; the testimony of Taylor PHI negotiator Weber that Tchibassa was FLEC's "chief spokesman," "did all the primary speaking as negotiator," was "at times . . . quite forceful"—on occasions he would "raise his voice . . . talking over them" and "would bang the table on occasions—was "obviously passionate about his cause," "quite often" told the negotiators "how long he had been a member of [FLEC] and just how much this all meant to him" and, along with the other two FLEC negotiators, "took full claim and credit" for the hostage-taking so that "there was never any disputing the fact that they abducted and held Brent Swan," 9/9/03 Tr. 64, 9/5/03 Tr. 184-85; 9/10/03 Tr. 29, 31-32; 9/5/03 Tr. 1845; testimony of both the government and Chevron negotiators that Tchibassa was intent on obtaining a cash ransom "specifically for the purchase of arms" in the face of the negotiators' contrary insistence and after they "managed to persuade him that they could not have military equipment," 9/5/03 Tr. 141, 9/10/03 Tr. 28; Tchibassa's own characterization of Swan's abduction and imprisonment as simply "the questioning of BRENT SWAN by the troops of our movement" and an "incident," insisting it was "neither a terrorist act nor an

act of piracy or kidnapping [sic]," JA 58; and, finally, Tchibassa's signature on receipts for goods delivered to FLEC as ransom in January 1991, 9/10/03 Tr. 33-34. On the other side, there is not a shred of evidence to affirmatively support Tchibassa's defense of innocent motive. Nor would Leitao's excluded testimony have significantly aided the defense. That Tchibassa may have striven zealously to negotiate the release of other hostages—and the accompanying payment of ransom—is fully consistent with the government's theory that Tchibassa was a willing participant in the entire Swan hostage-taking plan from the abduction through the ransom, seeking release of hostages in order to obtain ransom for FLEC. Nor does it blunt the impact of the extensive evidence that he participated throughout on behalf of FLEC and in furtherance of its goals. Given the overwhelming evidence in the record that Tchibassa conspired to commit hostage taking and committed hostage-taking as charged, we conclude that any error in the district court's evidentiary rulings, whether or not of constitutional dimension, was harmless. *See Satterwhite v. Texas*, 486 U.S. 249, 256 (1988) ("We generally have held that if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error is harmless and the verdict may stand." (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)); *United States v. Johnson*, 216 F.3d 1162, 1166 n.4 (D.C. Cir. 2000) ("[N]onconstitutional error is harmless if it did not have 'substantial and injurious effect or influence in determining the jury's verdict' " (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

### *C. Sentencing*

Finally, Tchibassa challenges his sentence on the ground that the district court erred under *United States v. Booker*, 543 U.S. 220 (2005), in treating the Guidelines as mandatory. Because Tchibassa did not challenge the court's reliance on the Guidelines at sentencing, we review the sentence for plain error

18

under Fed. R. Crim. P. 52(b). *United States v. Coles*, 403 F.3d 764, 767 (D.C. Cir. 2005). Under the plain-error standard, " 'there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." ' " *Id*. (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)) (alteration in *Johnson*)). Under *Coles*, the first two plain error requirements are met if a judge treats the Guidelines as mandatory because "[f]ollowing *Booker*, this [is] error and it is undoubtedly 'plain.' " *Id*. Thus, we need decide only whether the sentencing error affected substantial rights, that is, "whether there would have been a materially different result, more favorable to the defendant, had the sentence been imposed in accordance with the post-*Booker* sentencing regime." *Id*. In *Coles*, the court was unable to answer this question because the record was "insufficient for [the court] to determine with confidence whether the defendant suffered prejudice from the *Booker* error." *Id*. at 765. The court recognized, however, that "[t]here undoubtedly will be some cases in which a reviewing court will be confident that a defendant has suffered no prejudice," as, for example, " 'if a judge were to impose a sentence at the statutory maximum and say that if he could he would have imposed an even longer sentence.' " *Id*. at 769 (quoting *United States v. Paladino,* 401 F.3d 471, 483 (7th Cir. 2005)). In such a case, the imposition of the maximum sentence, combined with the judge's characterization of the sentence, makes manifest he would not have imposed a materially different sentence were he not constrained by the Guidelines. We find this to be such a case as well.

The district judge here sentenced Tchibassa at the very top of the applicable range—293 months—and identified this maximum permissible sentence as "appropriate" to "serve as a warning to those who will kidnap Americans abroad" and "*entirely appropriate* for the type of actions that occurred here in depriving Mr. Swan not only of his freedom for two months,

but basically of his life." 2/27/04 Tr. 34, 35 (emphasis added). The judge's strong and unambiguous approval of the sentence imposed, based—as he explained—on its deterrent effect and its proportionality to the crime committed, makes us confident that were the judge given the opportunity to resentence Tchibassa, applying the Guidelines as advisory rather than mandatory, he would not impose a sentence materially more favorable than the one he made plain he considered "appropriate."[12] Accordingly, we conclude Tchibassa was not prejudiced by the judge's sentencing error and see no ground for a sentencing remand. *Cf. United States v. Smith,* 401 F.3d 497, 499 (D.C. Cir. 2005) (no prejudice where judge twice—before and after remand—departed upward and stated: "I believe, in my view, that you deserve the sentence that will be imposed here.").

For the foregoing reasons, the appellant's conviction and sentence are affirmed.

*So ordered.*

---

[12]In *Coles*, the sentencing judge apparently expressed no personal view of the appropriateness of the 36 month sentence he imposed (which was" somewhat above the lower end of the 33-to-41 months Guidelines range," *Coles*, 403 F.3d at 769).