# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 12, 2012          Decided March 1, 2013

No. 07-3137

UNITED STATES OF AMERICA,
APPELLEE

v.

SAMUEL SANTANDER LOPESIERRA-GUTIERREZ,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00392-11)

*Carmen D. Hernandez*, appointed by the court, argued
the cause and filed the brief for appellant.

*Vijay Shanker*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With him on the brief was
*Lanny A. Breuer*, Assistant Attorney General.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and
SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Samuel Santander Lopesierra-
Gutierrez, a Colombian national, was extradited for, charged

with, and convicted of conspiracy to distribute cocaine with the knowledge or intent that it would be imported into the United States in violation of 21 U.S.C. §§ 959(a), 960, and 963. The district court sentenced Lopesierra to 300 months' incarceration. On appeal, he mounts numerous challenges to his conviction and sentence. Most significantly, he maintains that his trial attorney suffered from a conflict of interest that deprived him of his Sixth Amendment right to conflict-free representation and that excessive trial delays violated his constitutional and statutory speedy-trial rights. For the reasons given below, neither claim has merit. As to the rest of his claims, we conclude either that the district court made no error or that any such error was harmless.

## I.

In October 2002, Samuel Santander Lopesierra-Gutierrez, a member of the so-called Osorio drug-trafficking network, was arrested in Colombia and extradited to Washington, D.C. Upon arrival, he was arraigned and charged with conspiracy to distribute cocaine, knowing or intending that it would be imported into the United States. *See* 21 U.S.C. §§ 959(a), 960, 963. Over the next few years, fourteen other members of the Osorio gang were extradited from Colombia and charged with related offenses. By the end of an extended period of negotiation and discovery, most of Lopesierra's alleged coconspirators had pled guilty. The trial of the remaining defendants, Lopesierra and another man, Dolcey Padilla, began nearly four years after Lopesierra's initial arrest.

At trial, Lopesierra never seriously disputed that he trafficked in large quantities of cocaine—indeed, he conceded as much during closing argument. But Lopesierra maintained his innocence of the crime charged, claiming that he neither knew nor intended that the cocaine was bound for the United

States. *See* 21 U.S.C. §§ 959(a). The government, seeking to demonstrate that Lopesierra had the requisite mens rea when he distributed cocaine, introduced testimony focusing on several key transactions, including a 462-kilogram shipment to Puerto Rico. The government argued that this evidence, along with evidence of prior drug-importation activity and of money laundering in the United States, demonstrated Lopesierra's awareness that at least some of the cocaine he conspired to distribute would be imported to the United States. After a nearly two-month trial, during which Lopesierra never testified, the jury found him guilty of conspiracy to distribute five kilograms or more of cocaine knowing or intending that the cocaine would be imported into the United States. *See* 21 U.S.C. §§ 959(a), 960, 963. The district court imposed a below-guidelines sentence of 300 months.

Lopesierra appeals both his conviction and his sentence on myriad grounds. Two of his arguments—that he was denied his Sixth Amendment right to conflict-free representation and that the extensive trial delays violated his constitutional and statutory speedy-trial rights—merit in-depth analysis. We shall address these in Sections II and III and then consider his remaining nine arguments, running the gamut from evidentiary challenges to sentencing claims, in Section IV.

## II.

Lopesierra's first and most serious contention is that his trial counsel suffered from a conflict of interest that amounted to a Sixth Amendment violation that prejudiced his defense. Here's what happened. Quite literally on the eve of trial, the government discovered that a cooperating witness would testify that, in the course of laundering money in the United

States for Lopesierra, he had sent $96,000 to Lopesierra's attorney to cover legal fees. This testimony was part of the government's evidence regarding the statutorily required nexus between Lopesierra's activities and the United States. The government informed the court about the potential conflict of interest, explaining that the witness's testimony had spawned a Department of Justice investigation into whether the attorney had violated 18 U.S.C. § 1957, which criminalizes monetary transactions in property derived from unlawful activity. Arguing that the testimony and resulting investigation created an actual conflict of interest, the government moved to disqualify the attorney.

At a status conference the next day, Lopesierra's attorney insisted that he had no intention of withdrawing, that the witness could testify without identifying him as the recipient of the laundered funds, and that Lopesierra could waive any conflict. Speaking for himself, Lopesierra told the court that he was happy with the attorney's work and wanted him to continue. Following the conference, Lopesierra filed a response to the government's motion, which was signed by both the purportedly conflicted attorney and a law professor from whom the attorney had sought advice. In that response, Lopesierra maintained that he had the right to continued representation by his counsel of choice notwithstanding the alleged conflict of interest. According to Lopesierra, the conflict could be avoided so long as the witness never mentioned the attorney by name. He also emphasized that he wished to waive any potential conflict of interest. In response, the government agreed that Lopesierra could waive the conflict—so long as he did so knowingly and voluntarily. The government also acquiesced to a stipulation about the laundered funds that omitted the attorney's identity.

The district court then held another status conference, at which Lopesierra was represented by appointed conflict counsel and at which the law professor appeared by telephone. Both lawyers, as well as the government, agreed that Lopesierra could waive any conflict of interest. After considering both parties' statements and submissions, the district court concluded that any conflict of interest was in fact waivable. It then proceeded to engage Lopesierra, again represented by conflict counsel, in a detailed waiver colloquy. In response to the court's questioning, Lopesierra assured the court that he was aware of the source of the conflict, that he understood its nature, and that he knew he had a right to conflict-free representation. Lopesierra confirmed that he had been thoroughly advised by conflict counsel, insisted that he had carefully considered his waiver decision, and made clear that he understood he was waiving his right to later claim that he had been prejudiced by a conflict of interest. Given all this, the district court found that Lopesierra had "knowingly, intelligently, [and] voluntarily waived any conflict of interest." Lopesierra's original attorney went on to represent him at trial.

On appeal, Lopesierra, now represented by new counsel, argues that he was denied his Sixth Amendment right "to have the Assistance of Counsel for his defence," U.S. Const. amend. VI, which includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). Lopesierra begins by attempting to demonstrate that "an actual conflict of interest adversely affect[ed] the adequacy of [his] representation." *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 349–51 (1980)). Only then does he turn to the question whether his waiver bars his claim. We begin with the decisive issue: waiver.

Criminal defendants frequently waive their constitutional rights. By entering a guilty plea, for instance, a defendant waives rights as fundamental as the "privilege against compulsory self-incrimination, [the] right to trial by jury, and [the] right to confront his accusers." *McCarthy v. United States*, 394 U.S. 459, 466 (1969). Of course, such waivers are subject to strict oversight by the court, which must find that they are made knowingly and voluntarily. *See Godinez v. Moran*, 509 U.S. 389, 400 (1993). Like these other constitutional rights, the Sixth Amendment right to conflict-free representation is subject to knowing and voluntary waiver. *See Wheat v. United States*, 486 U.S. 153, 160 (1988); *see also United States v. Childress*, 58 F.3d 693, 734–36 (D.C. Cir. 1995) (per curiam). A defendant's power to waive this right is grounded in another right situated in the Sixth Amendment: the right to counsel of choice. *See Wheat*, 486 U.S. at 160.

In cases like this, where a defendant's chosen counsel suffers from a conflict of interest, the two Sixth Amendment rights come into clear conflict. Also implicated are the court's own institutional interests, as guaranteeing conflict-free counsel protects not just defendants' rights, but also the "[f]ederal courts['] . . . independent interest in ensuring that criminal trials are conducted within the ethical standards of the [legal] profession and that legal proceedings appear fair to all who observe them." *Id.* at 161. Taking the court's interests into consideration, the Supreme Court has held that a defendant's counsel-of-choice right may sometimes be trumped by a conflict of interest. *See id.* at 159 ("[T]he essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer

whom he prefers."). Specifically, a court may decline to accept a waiver if the conflict of interest jeopardizes the integrity of the proceedings. *See id.* at 162; *see also Childress*, 58 F.3d at 734–36. In making this determination, a court balances the defendant's right to choose his representative against *both* the defendant's countervailing right to conflict-free representation *and* the court's independent interest in the integrity of criminal proceedings. *Cf. United States v. Edelmann*, 458 F.3d 791, 806–07 (8th Cir. 2006). The outcome of that balance turns on the nature and extent of the conflict. We review a district court's decision to accept or reject a waiver for abuse of discretion. *See Childress*, 58 F.3d at 734.

Attempting to get around his waiver, Lopesierra argues that his lawyer's conflict of interest was so serious that it was simply unwaivable. Alternatively, he contends that, even if the conflict was waivable, his waiver was neither knowing nor voluntary.

Lopesierra's primary argument relies heavily on a line of Second Circuit decisions that have defined a "very narrow category of cases" in which a conflict of interest is never subject to waiver. *United States v. Perez*, 325 F.3d 115, 126 (2d Cir. 2003). In this class of cases, a district court that accepts a waiver necessarily abuses its discretion because the "conflict so permeates the defense that no meaningful waiver can be obtained." *United States v. Fulton*, 5 F.3d 605, 613 (2d Cir. 1993). Lopesierra urges us to adopt the Second Circuit's approach and hold that this category of per se unwaivable conflicts includes those cases in which the attorney is the subject of a criminal investigation. Alternatively and more narrowly, we take his position to be that such conflicts are

unwaivable at least where the attorney's supposed crime is related to the defendant's.

The broader position is untenable. Lopesierra points to no circuit that has accepted the proposition that attorneys who are the subject of criminal investigations are incapable of providing constitutionally adequate representation, and the government identifies numerous circuits that have rejected it. *See, e.g.*, *Edelmann*, 458 F.3d at 806–08; *Reyes-Vejerano v. United States*, 276 F.3d 94, 99 (1st Cir. 2002); *United States v. Montana*, 199 F.3d 947, 949 (7th Cir. 1999). Indeed, even the Second Circuit cases on which Lopesierra relies do not purport to extend to every scenario in which "a court learns that an attorney may have committed a crime," but rather only to situations in which an attorney is implicated in a "sufficiently related" crime. *Fulton*, 5 F.3d at 611. This line makes sense. Whenever an attorney is or is likely to be the subject of a criminal investigation, courts worry that he might attempt to curry general favor with the government by pulling punches. Although this concern is serious, it hardly supports a conclusion that "no rational defendant would knowingly and voluntarily desire the attorney's representation." *United States v. Martinez*, 143 F.3d 1266, 1270 (9th Cir. 1998) (internal quotation marks omitted). But when the attorney's alleged criminal activity is "sufficiently related to the charged crimes," *Fulton*, 5 F.3d at 611, courts have an additional concern: the attorney's "fear that evidence concerning [his] involvement might come out" could potentially "affect virtually every aspect of his . . . representation of the defendant." *Id.* at 613. For instance, the attorney's advice to a defendant about whether to cooperate, plead guilty, or take the stand could be colored by the attorney's calculations about the likelihood that the defendant's cooperation or testimony would reveal evidence of his own crimes.

Given the seriousness of this kind of conflict, we might agree with the Second Circuit that when an attorney is accused of a "sufficiently related" crime, the resulting conflict "create[s] a real possibility that the attorney's vigorous defense of his client will be compromised." *Id.* at 611. Were we faced with the situation presented in *Fulton*—where a witness against a defendant charged with conspiracy to possess and import heroin accused defense counsel of personally receiving a portion of a heroin shipment and being otherwise involved in heroin trafficking, *see id.* at 607—we may well have concluded that accepting a waiver amounted to an abuse of discretion. But that is not this case. Lopesierra's attorney was accused only of accepting payment for his services in laundered funds. True, those laundered funds were allegedly the product of the charged cocaine-importation conspiracy. That, however, was the full extent of his supposed connection to Lopesierra's crimes. Although the attorney's alleged criminal activity thus in some sense "related" to Lopesierra's, we see a significant difference between an attorney who conspired with the defendant to distribute drugs and one who was merely paid in laundered funds. In the former case—where it is impossible to discern, for instance, which witnesses the attorney might decline to call or hesitate to cross-examine for fear they will implicate *him*—every single aspect of representation could be infected, every choice suspect. But where the relationship between the attorney's alleged crime and the defendant's is as attenuated as here, the extent of the conflict is clear and can be mitigated by stipulation. A rational defendant—who may well have been responsible for and fully aware of the fact that his attorney was paid with profits from unlawful activity—could thus make an informed choice to proceed in such a circumstance.

Accordingly, we hold that where the only relationship between the attorney's possible crime and the defendant's is the receipt of laundered funds and where a stipulation bars presentation of incriminating testimony, the resulting conflict is not per se unwaivable. *See United States v. Saccoccia*, 58 F.3d 754, 771 (1st Cir. 1995) (upholding waiver where the attorney allegedly "conspired with appellant to launder the fruits of unlawful activity"). In cases such as this, the knowing and voluntary requirement, coupled with the abuse of discretion standard, strikes the appropriate balance between protecting defendants from conflicted representation and preserving their right to counsel of choice. If in the context of a particular case the district court believes a conflict is intolerable, it may decline to accept a defendant's waiver. But here, where the conflict was less serious, the district court acted well within its discretion by concluding that Lopesierra's right to counsel of choice carried the balance.

This brings us, then, to Lopesierra's fallback position—that his waiver was neither knowing nor voluntary. But we have no doubt that it in fact was both. The district court held multiple hearings on this issue and went to great lengths to ensure that Lopesierra, who was represented by an independent attorney, was fully aware of the nature of the conflict and the consequences of waiver. The court explained, for instance, that because the attorney was himself the subject of a related criminal investigation, he might "have a divided loyalty between his interests and [Lopesierra's] interests" and could "be in some way tempted to take actions that might not be to [Lopesierra's] benefit in order to assist himself in connection with this other investigation." It further emphasized that Lopesierra had a right to an attorney who lacked such a conflict and warned that "going forward could be ill-advised." In response to all of this, Lopesierra

repeatedly told the court that he was "100 percent" determined to continue with the attorney who had been representing him for three years. He also assured the court that he understood he was waiving any argument that he was "in some way prejudiced because [the attorney] had this conflict of interest."

We cannot conceive of—and Lopesierra fails to suggest—anything more the district court could have done to protect his rights. In the end, Lopesierra made a rational and informed decision that, given the stipulation and the limited nature of his attorney's conflict, he wanted to proceed. That he now wishes he had chosen differently gives us no reason to doubt the validity of that choice.

## III.

Lopesierra's second major claim focuses on the substantial delay between his initial arrest and his trial. Asserting his constitutional and statutory speedy-trial rights, Lopesierra maintains that the three-and-a-half years he had to wait was simply too long. On both the constitutional and statutory claims, we review the district court's legal conclusions de novo and its findings of facts for clear error. *See United States v. Tchibassa*, 452 F.3d 918, 924 (D.C. Cir. 2006) (Sixth Amendment); *United States v. Subblefield*, 643 F.3d 291, 294 (D.C. Cir. 2011) (Speedy Trial Act). Although we understand Lopesierra's frustration with the pace of proceedings, we ultimately find that given the complexity of the case the delay fell within lawful bounds.

In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court established a four-factor test for determining whether a defendant has been deprived of his Sixth Amendment right to a speedy trial: "[l]ength of delay, the reason for the delay, the

defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. Applying these factors, we have emphasized that "[n]one . . . is either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial; rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Tchibassa*, 452 F.3d at 923 (internal quotation marks and alteration omitted). Here, it is indisputable that the delay was significant—two-and-a-half years longer than the one-year delay the Supreme Court has suggested to be "presumptively prejudicial." *Doggett v. United States*, 505 U.S. 647, 651–52 & n.1 (1992). Nevertheless, it was considerably shorter than delays tolerated in prior cases. *See, e.g.*, *Tchibassa*, 452 F.3d at 927 (no violation despite eleven-year delay). And more importantly, when the Supreme Court observed that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge," *Barker*, 407 U.S. at 531, it could have been referring to this very case.

Here, the district court and numerous attorneys had to untangle a complicated and far-reaching conspiracy, execute fifteen extraditions, fairly treat all fifteen co-defendants, collect and decipher foreign evidence, and coordinate with foreign witnesses—all serious obstacles to a quick resolution. Furthermore, Lopesierra, who himself contributed to the delay by filing pretrial motions, taking an interlocutory appeal, and seeking a continuance, fails to demonstrate that the government was to blame for the delay. Nor does he offer reason to believe that the delay actually prejudiced his defense. Accordingly, we conclude that the delay, though significant, was neither so unjustified nor so prejudicial as to violate the Sixth Amendment, and we thus turn to Lopesierra's statutory claim.

The Speedy Trial Act provides that "the trial of a defendant charged . . . with the commission of an offense shall commence within *seventy days* from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1) (emphasis added). Subsection h of the statute enumerates certain periods of delay that "shall be excluded in . . . computing the time within which the trial of any such offense must commence." *Id.* § 3161(h).

Here, the speedy-trial clock's start and stop dates are undisputed: respectively, Lopesierra's arraignment on September 2, 2003, and the date on which trial began, April 18, 2006. There were 959 days in between. The only question is whether delays permitted by subsection h make up the difference between the statutorily allotted 70 days and the 959 that actually elapsed. Lopesierra concedes that much of this time may be properly excluded from the clock under one of subsection h's automatic-exclusion provisions. For instance, he acknowledges that the 338-day period between his arraignment and the arraignment of the last-extradited co-defendant was properly and automatically excluded. *See id.* § 3161(h)(6) ("A reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted."). Ultimately, the only exclusions he seriously contests are two "ends of justice" stays that cover the ground between August 4, 2004, and November 25, 2005, after which time automatic exclusions based on Lopesierra's filing of a motion for release, *see id.* § 3161(h)(1)(D) (excluding "delay resulting from any pretrial motion"), and interlocutory appeal,

*id.* § 3161(h)(1)(C) (excluding "delay resulting from any interlocutory appeal"), kicked in.

The first of the contested "ends of justice" stays would present no problem at all were it not for the unusual absence from the docket of a district court order. We pick up this mystery on August 14, 2003, well before the end of the first automatic stay, when the government filed a motion to exclude time from the speedy-trial clock under Section 3161(h)(7), which permits a judge to grant an exclusion where "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," *id.* § 3161(h)(7)(A). No order either granting or denying that motion appears on the docket. Indeed, not until almost two years later, on May 26, 2005, when the district court granted a subsequent Speedy Trial Act motion, does any order stopping the speedy-trial clock appear on the docket. *See generally* Order, *United States v. Osorio Ortega*, No. 02-00392 (D.D.C. May 26, 2005). Given this, Lopesierra makes a straightforward argument: no order tolled the speedy-trial clock during the 293 days between the expiration of the automatic stay and the district court's 2005 order, and because the district court has no authority to retroactively toll the clock, dismissal is required.

An examination of the record, however, makes clear that the phantom order *was* actually issued and its absence from the docket resulted from a clerical error. In memoranda regarding the government's second Speedy Trial Act motion, both parties acknowledged that the district court had in fact issued an order granting the government's initial motion. In fact, Lopesierra's memorandum appears to quote directly from the missing order:

> [T]he Government served on defense Counsel a motion asking the Court to toll the Speedy Trial Clock ("STC"), under 18 U.S.C. 3161 (h)7 and (h)8, which was granted *"until the last Defendant or some other Defendant identified by the Court [was] extradited from their native Colombia,"* (h)(7), as well as because the case was *"complex due to the nature of the prosecution,"* Discovery being so ample, *"witnesses resid[ing] outside the United States,"* and the possibility that the case *"may present novel questions of fact or law."* This order does not appear on the docket sheet but defendant accepts the fact that it was signed.

Defendant Santander Lopesierra's Response in Opposition to Government's Second Motion to Stay Speedy Trial Act at 1, *United States v. Osorio Ortega*, No. 02-00392 (D.D.C. Apr. 28, 2005). Lopesierra's own filing thus put the existence of the order beyond dispute, and the portions of the order he quotes enumerate perfectly adequate reasons for granting a stay. Moreover, these reasons are confirmed and reiterated on the record in the district court's order granting the government's second motion. *See* Order at 1, *United States v. Osorio Ortega*, No. 02-00392 (D.D.C. May 26, 2005) (noting that the court had "previously granted the Government's first Motion to Stay the Speedy Trial Act on grounds that several defendants had not been extradited from Col[o]mbia and due to the complexity and nature of the prosecution"). This suffices to satisfy Section 3161(h)(7)'s requirement that the court's findings be "set[ ] forth, in the record of the case." 18 U.S.C. § 3161(h)(7)(A); *see Zedner v. United States*, 547 U.S. 489, 506–07 (2006); *United States v. Edwards*, 627 F.2d 460, 461 (D.C. Cir. 1980) (per curiam).

Having solved the mystery of the phantom order, we turn to the second contested "ends of justice" stay. According to Lopesierra, the district court failed to give a sufficient explanation of its reasons for granting the government's second motion to toll the speedy-trial clock. The district court stayed the clock for an additional six months, finding, as the statute requires, that the stay served the "ends of justice" and "outweigh[ed] the best interest of the public and the [remaining] defendant[s] in a speedy trial." *See* Order at 1, *United States v. Osorio Ortega*, No. 02-00392 (D.D.C. May 26, 2005). In so doing, the court explained that it had considered the statutory factors, reciting some of the more pertinent ones: "the complexity of the case, the nature of the prosecution, and that it would be 'unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established' under the Act." *See id.* at 2.

Lopesierra maintains that because only two defendants remained for trial and all discovery had been produced, the district court had no basis for finding that the case remained complex. According to Lopesierra, docket congestion—a statutorily impermissible consideration, *see* 18 U.S.C. § 3161(h)(7)(C)—was among the "real" reasons the district court granted the exclusion. But we have little difficulty concluding that the district court's explanation suffices. The court expressly invoked relevant factors and weighed the competing interests. Presented with no plausible justification for doing otherwise, we take the district court at its word.

## IV.

We can quickly dispatch with Lopesierra's many remaining claims: three evidentiary issues, three challenges to the jury instructions, two sentencing issues, and an

overarching argument that, given all of these supposed errors, Lopesierra was deprived of a fundamentally fair trial.

*Evidentiary Claims*

Lopesierra challenges the admission of two pieces of evidence, as well as the sufficiency of the evidence with respect to his state of mind.

Lopesierra's first challenge is to the admission of a recorded phone call that the government failed to identify on its exhibit list during pretrial discovery. Because the defense relied at trial on the absence of the recording from the exhibit list, Lopesierra maintains that the district court should have denied the government's motion to introduce it mid-trial. We disagree. The government produced the recording during discovery, as Federal Rule of Criminal Procedure 16 requires, and it agreed to exclude the evidence if the defense refrained from suggesting that no such recording existed. The defense, fully aware of the consequences of doing so, opened the door to the recording's admission by continuing its line of questioning. Under these circumstances, the district court acted well within its discretion. *See United States v. Smart*, 98 F.3d 1379, 1386 (D.C. Cir. 1996) ("This court reviews a trial judge's admission of evidence for abuse of discretion.").

Lopesierra next contests the admission of testimony about his 1996 involvement in a conspiracy to ship cocaine to Miami. This incident took place prior to the start of the charged conspiracy, and the district court admitted it for the limited purpose of showing knowledge or intent. According to Lopesierra, admission of this evidence violated the so-called doctrine of specialty, which provides that "once extradited, a person can be prosecuted only for those charges on which he was extradited." *United States v. Sensi*, 879 F.2d 888, 892

(D.C. Cir. 1989). We have previously noted conflicting authority as to whether a criminal defendant—as opposed to the extraditing state—has standing to assert the doctrine of speciality. *See id.* at 892 n.1 (collecting cases). But even assuming Lopesierra can make this claim, *see id.* (declining to resolve this question and proceeding to the merits), it is without merit. We agree with the other circuits to have considered this question that the doctrine of specialty governs prosecutions, not evidence. *See, e.g.*, *United States v. Garcia*, 208 F.3d 1258, 1261 (11th Cir. 2000), *vacated on other grounds*, 531 U.S. 1062 (2001); *Leighnor v. Turner*, 884 F.2d 385, 390 (8th Cir. 1989). Testimony about the 1996 incident was introduced only as evidence of the crime for which Lopesierra was extradited, the 1999–2002 conspiracy. Because he was never prosecuted for any crime stemming from the 1996 incident, the doctrine of specialty has no bearing here.

Our review of Lopsierra's third claim—that the jury lacked sufficient evidence to conclude that he knew or intended that the drugs he distributed would be imported into the United States—is "highly circumscribed." *United States v. Battle*, 613 F.3d 258, 264 (D.C. Cir. 2010). Indeed, we must uphold the jury's verdict if " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Andrews,* 532 F.3d 900, 903 n.1 (D.C. Cir. 2008) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). Because Lopesierra failed to renew his motion for judgment of acquittal at the close of all the evidence, this already "exceedingly heavy burden" is made "even heavier." *United States v. Booker*, 436 F.3d 238, 241 (D.C. Cir. 2006) (internal quotation marks omitted). Unless " 'declining to consider the sufficiency of the evidence . . . cause[s] a manifest miscarriage of justice,' " *id.* (quoting

*United States v. Thompson,* 279 F.3d 1043, 1051 (D.C. Cir. 2002)), Lopesierra will be considered to have waived his claim.

Viewed in the light most favorable to the prosecution, *see Andrews,* 532 F.3d at 903 n.1, the evidence clearly supports an inference of knowledge or intent. For example, witnesses testified to Lopesierra's statements that the drugs he purchased were to be transported to Puerto Rico, that 462 kilograms of cocaine had in fact arrived there, and that Puerto Rican buyers were complaining about drug quality. Given all this, Lopesierra comes nowhere close to demonstrating the "manifest miscarriage of justice" required for reversal.

### Jury Instructions Claims

Lopesierra argues that the district court erred by declining to give a multiple-conspiracies instruction. He emphasizes that he had little interaction with co-defendant Padilla and maintains that the evidence demonstrated the existence of three distinct conspiracies—a conspiracy to distribute cocaine knowing or intending that it would be imported into the United States (the one charged), a conspiracy to distribute cocaine within Puerto Rico, and a conspiracy to commit money laundering. We review a district court's refusal to give a multiple-conspiracies instruction de novo. *See United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009). If the record supports the existence of multiple conspiracies, the district court errs by failing to instruct the jury accordingly. *See id.*

In distinguishing a single conspiracy from multiple conspiracies, we ask "whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the

plan." *Id.* Although Lopesierra and Padilla may have been involved in different aspects of the conspiracy, "there is no requirement that each conspirator [even] know the identity of every other conspirator." *United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C. Cir. 1991). Rather, we have "require[d] only that the main conspirators"—here, the higher ups in the Osorio network, not the two defendants who went to trial— "work with all the participants." *United States v. Hemphill*, 514 F.3d 1350, 1363 (D.C. Cir. 2008). And while some of the cocaine distributed by the Osorio group was not bound for the United States, that fact, in and of itself, fails to demonstrate the existence of multiple conspiracies. Not only has Lopesierra failed to cite any support for such a proposition, but so holding would render most drug-distribution conspiracies subject to parsing.

Next, Lopesierra asserts that the district court should have instructed the jury that it had to unanimously find *either* "knowledge" *or* "intent," the two states of mind covered by 21 U.S.C. § 959(a). Because he failed to raise this issue at trial, we review only for plain error. *See United States v. Hurt*, 527 F.3d 1347, 1353 (D.C. Cir. 2008).

Lopesierra cites nothing to suggest that, where a statute contemplates alternative states of mind, a jury must unanimously agree about which one the defendant in fact possessed. To the contrary, several circuits, relying on the Supreme Court's decision in *Schad v. Arizona*, 501 U.S. 624 (1991), have squarely held that "a district court is not required to instruct the jury that it must unanimously agree as to which mens rea the defendant possessed at the time of the offense." *United States v. Felts*, 579 F.3d 1341, 1344 (11th Cir. 2009) (per curiam). We agree. That the statute encompasses both "knowledge" and "intent" brings it nowhere close to the

"point at which distinct incidents go from being different means of committing the same crime, to being different crimes." *Hurt*, 527 F.3d at 1353.

Finally, Lopesierra challenges the instruction the district court gave when the jury sent a note explaining that it was "having difficulty coming to a unanimous decision," notwithstanding eighteen hours of deliberations. In response to the note, the district court gave a version of an "initial instruction" listed in the Criminal Jury Instructions for the District of Columbia—then designated Instruction 2.91, now designated Instruction 2.601:

> Your note indicates the jury has been unable, at this point, to reach a unanimous verdict as to both Defendants. My best judgment is that you have been deliberating for a total of about 18 hours, which is not unusual in a case of this duration.
>
> Consequently, I am going to ask that you deliberate further in this case and continue to give it your best efforts. You may resume your deliberations tomorrow morning. You are done for today. A good night's rest might be of some assistance to you.

The court also reminded the jury that it had already given a multiple-defendant instruction, which stated that "at any time during your deliberations you may return your verdict of guilty or not guilty with respect to any Defendant, after which you may resume your deliberations as to any remaining Defendants."

Lopesierra objects to the court's decision to instruct the jury to continue deliberating instead of declaring a mistrial, to

its use of the "initial instruction" instead of the anti-deadlock instruction we approved in *United States v. Thomas*, 449 F.2d 1177 (D.C. Cir. 1971) (en banc), and to its reference to the previously given instruction about multiple defendants. Lopesierra's failure to request a mistrial or object renders this claim subject only to plain-error review. *See United States v. Yarborough*, 400 F.3d 17, 20 (D.C. Cir. 2005). The district court's instructions easily clear that low bar. The "initial instruction" was appropriate and no more coercive than that approved in *Thomas*, and its reference to the multiple defendant instruction—which correctly stated the law— suggested no particular result.

*Sentencing Claims*

In support of his first sentencing claim, Lopesierra invokes *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in which the Supreme Court held that a jury must find any facts "that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at 490 (internal quotation marks omitted). According to Lopesierra, *Apprendi* required the jury to find the quantity of drugs attributable to Lopesierra individually—as opposed to the quantity attributable to the conspiracy as a whole. But we need not resolve this issue, for even assuming *Apprendi* error, such error was harmless. *See United States v. Lafayette*, 337 F.3d 1043, 1049 (D.C. Cir. 2003) (*Apprendi* errors subject to harmless-error review). Although the jury convicted Lopesierra for conspiracy to import only five kilograms, record evidence shows that he was personally involved in the importation of many times that weight. The Puerto Rico transaction alone involved 462 kilograms. Accordingly, we have no doubt that the jury would have found the importation of at least five kilograms to have been reasonably foreseeable by Lopesierra himself.

Lopesierra also challenges the substantive reasonableness of his 300-month sentence, which fell below the 324- through 405-month guidelines range. We review such claims for abuse of discretion. *See United States v. Hall*, 610 F.3d 727, 744 (D.C. Cir. 2010). Moreover, a rebuttable presumption of reasonableness applies to sentences within the guidelines range. *See United States v. Lawrence*, 662 F.3d 551, 563 (D.C. Cir. 2011). Indeed, it is "hard to imagine" how a sentence "*below* the range we ordinarily view as reasonable" could be unreasonably high. *United States v. Mejia*, 597 F.3d 1329, 1343 (D.C. Cir. 2010). Insisting that his sentence was nonetheless unreasonable, Lopesierra emphasizes that his co-defendants received more lenient sentences as a result of pleading guilty and contends that his higher sentence thus infringed on his Sixth Amendment right to choose trial by jury. This claim is meritless. That some defendants pled guilty while others did not provides a perfectly valid basis for a sentencing disparity, *see id.* at 1344, and such disparity imposed no impermissible burden on Lopesierra's jury-trial right, *see United States v. Jones*, 997 F.2d 1475, 1477–80 (D.C. Cir. 1992) (en banc).

*Fundamental-Fairness Claim*

Finally, Lopesierra argues that even if none of the errors he has alleged, taken alone, requires reversal, their cumulative effect deprived him of his right to a fundamentally fair trial. Again, we disagree. Lopesierra was fairly tried, convicted, and sentenced. Our laws require nothing more.

**V.**

For the foregoing reasons, we affirm both Lopesierra's conviction and his sentence.

24

*So ordered.*